UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| ANDREW GREGORY SPOTTED ELK, | |
| Plaintiff, | 4:22-CV-04031-LLP |
| vs. | |
| AW BENTENE, in their official capacity; ALEX HANSON, S.I.U., in their individual and official capacity; TROY ELLISE, Restrictive Housing Hearing Board member, in their individual and official capacity; R. VANDEREA, Restrictive Housing Board Member, in their individual and official capacity; D. BIEBER, Restrictive Housing Hearing Board Member, in their individual and official capacity; JEN DRIESKE, in her individual and official capacity; JESSICA COOK, a/k/a Mrs. Cook, Associate Warden Jameson, in her individual and official capacity; JEANNIE BERTCH, a/k/a J. Bertch, Restrictive Housing Manager, Associate Warden Jameson, in her individual and official capacity; ERIC TIMMERMAN, Restrictive Housing Staff Member, in his official capacity; SETH HUGHES, A-Floor Unit Manager, in his official capacity; TROY PONTO, Deputy Warden, in his official capacity; LT. M. JONES, Disciplinary Hearing Officer, in their official capacity; TIFFANY STOYNOV, Unit Coordinator, in her individual and official capacity; CATHY WYNIA, Special Investigator (SIU), in her individual and official capacity; M. WARD, Case Manager, in their individual and official capacity; and CHAD ROTERT, Associate Warden, in his individual and official capacity, | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

Andrew Gregory Spotted Elk, an inmate at the South Dakota State Penitentiary (SDSP),

filed this *pro se* civil rights lawsuit under 42 U.S.C. § 1983 alleging that his conditions of

confinement violated his constitutional rights. Doc. 1. This Court screened Spotted Elk's amended complaint under 28 U.S.C. § 1915A, dismissing it in part and directing service in part. Doc. 35. The claims that survived screening and remain pending are (1) Spotted Elk's Fourteenth Amendment due process claim for insufficient notice against Defendants Troy Ellis,[1] R. Vanderaa,[2] D. Bieber, Jen Dreiske,[3] Jessica Cook, and Jeannie Bertsch,[4] in their individual capacities; (2) Spotted Elk's Fourteenth Amendment due process claim for insufficient notice against Defendants AW Benting,[5] Troy Ellis, R. Vanderaa, D. Bieber, Jessica Cook, Jeannie Bertsch, Eric Timmerman, Seth Hughes, Troy Ponto, and Lt. M. Jones in their official capacities for injunctive relief only; and (3) Spotted Elk's First Amendment retaliation claim against Defendants Alex Hanson and Tiffany Stoynov, in their individual and official capacities for injunctive relief only. Defendants move for summary judgment on all claims. Doc. 49. Spotted Elk opposes Defendants' motion for summary judgment. Docs. 56, 57, 58. For the reasons stated below, Defendants' motion for summary judgment is granted.

## FACTUAL BACKGROUND

### I.    Preliminary Statement

At the outset, the Court notes that Spotted Elk's amended complaint and his papers submitted in opposition to Defendants' motion for summary judgment are not verified, and he

---

[1] In his amended complaint, Spotted Elk spells this defendant's last name as Ellise. This Court will refer to this defendant using the correct spelling of the last name, Ellis.

[2] In his amended complaint, Spotted Elk spells this defendant's last name as Vanderea. This Court will refer to this defendant using the correct spelling of the last name, Vanderaa.

[3] In his amended complaint Spotted Elk spells this defendant's last name as Drieske. This Court will refer to this defendant using the correct spelling of the last name, Dreiske.

[4] In his amended complaint Spotted Elk spells this defendant's last name as Bertch. This Court will refer to this defendant using the correct spelling of the last name, Bertsch.

[5] In his amended complaint, Spotted Elk spells this defendant's last name as Bentene. This Court will refer to this defendant using the correct spelling of the last name, Benting.

has not submitted any affidavits. *See* Docs. 36, 56, 57, 58. Although a *pro se* plaintiff is entitled

to the benefit of a liberal construction of his pleadings, *Stone v. Harry*, 364 F.3d 912, 914 (8th

Cir. 2004), the standards for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure remain applicable. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987)

(per curiam). Further, a litigant's *pro se* status does not permit noncompliance with court rules

and directives. *See Bennett v. Dr Pepper/Seven Up, Inc*., 295 F.3d 805, 808 (8th Cir. 2002);

*Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005). That said, Spotted Elk submitted several

documents in support of his amended complaint that the Court will consider. Spotted Elk also

responded to Defendants' statement of material facts, but his response did not include

"appropriate citations to the record" as required by D.S.D. Civ. LR 56.1(B). Some of the

documents attached to Spotted Elk's complaint and response to Defendants' statement of

material facts contain his handwritten notes. *See, e.g.*, Doc. 1-1 at 60, 64; Doc. 58-1 at 9. Spotted

Elk's handwritten notes are self-serving, unsupported allegations which cannot be relied on to

defeat summary judgment. *Phox v. 21C Management LLC*, No. 20-CV-00846-SRB, 2022 WL

345654, at *5 n.8 (W.D. Mo. Feb. 4, 2022); *see also Turner v. Mull*, 784 F.3d 485, 489 (8th Cir.

2015) ("[The non-moving party] may not merely point to unsupported self-serving allegations,

but must substantiate allegations with sufficient probative evidence that would permit a finding

in [his] favor." (quotation omitted) (second alteration in original)).

II.     **Fourteenth Amendment Due Process Claim for Insufficient Notice**

   A.     **Placement in Restrictive Housing**

      On or about June 3, 2020, Spotted Elk's cell mate reported that Spotted Elk had sexually

assaulted him. Doc. 52 ¶ 3. Spotted Elk was removed from the general population and placed in

the Segregated Housing Unit (S.H.U.) while the Prison Rape Elimination Act (PREA) incident

was investigated. Doc. 53 ¶ 9; Doc. 58 ¶¶ 9–10. An investigator at the SDSP contacted Jon

Basche, an agent with South Dakota Division of Criminal Investigation (DCI), to assist with

investigating a reported inmate rape at the SDSP. Doc. 50-38; Doc. 52 ¶ 10; Doc. 53 ¶ 11; Doc.

58 ¶ 11. Spotted Elk had been identified as a suspect. Doc. 53 ¶ 11; Doc. 58 ¶ 11. Agent Basche

interviewed Spotted Elk on June 4, 2020. Doc. 52 ¶ 11; Doc. 53 ¶ 12; Doc. 58 ¶ 12. Agent

Basche informed Spotted Elk that he was investigating Spotted Elk's cellmate's report that

Spotted Elk had sexually assaulted him. Doc. 50-39 at 1; Doc. 52 ¶ 11; Doc. 53 ¶ 12; Doc. 58

¶ 12. During the interview, Spotted Elk denied sexually assaulting his cellmate. Doc. 50-39 at 1;

Doc. 52 ¶¶ 12–13; Doc. 53 ¶¶ 13–14; Doc. 58 ¶¶ 13–14. When Agent Basche asked Spotted Elk

if he would be willing to take a polygraph test regarding the incident, Spotted Elk agreed to

submit to a polygraph test. Doc. 50-39 at 1; Doc. 52 ¶ 14; Doc. 53 ¶ 15; Doc. 58 ¶ 15.

On June 11, 2020, Spotted Elk was transported to the Sioux Falls Police Station to

undergo a polygraph test. Doc. 53 ¶ 15; Doc. 58 ¶ 15. Agent Brian Schnabel conducted the

polygraph test. Doc. 50-41; Doc. 53 ¶ 15; Doc. 58 ¶ 15. After the polygraph test, Spotted Elk was

informed that he had failed and had shown signs of deception. Doc. 1-1 at 64; Doc. 53 ¶ 16.

Spotted Elk contends that he does not "know how [he] fail'd such poly but [he] was the 1 who

asked for it and to have DCI review footage[.]" Doc. 1-1 at 64. Spotted Elk complains about the

questions asked during the polygraph. Doc. 58 ¶ 16.

On July 1, 2020, Spotted Elk was served with a Restrictive Housing Notice of Initial

Hearing. Doc. 1-1 at 36; Doc. 51 ¶ 62; Doc. 53 ¶ 30. According to the notice, Spotted Elk was

issued a Restrictive Housing referral for assault and/or related acts, which are defined as:

> a.    The Inmate has caused or attempted to cause serious physical harm
> (requiring immediate medical attention, emergency treatment or hospitalization)
> or death to another person; or

b.      The Inmate compelled or coerced another person by force or the threat of serious physical harm or death, to engage in any sexual act or sexual abuse; or

c.      The Inmate compelled or coerced another person by force or the threat of serious physical harm or death, to provide anything of value, to perform any act in violation of any DOC rule.

Doc. 1-1 at 31. The notice of hearing form requires that a "detailed explanation of support must be provided for each of the criteria checked above. Details should include references to any disciplinary reports and the results of any related disciplinary hearings." *Id.* at 32. According to the notice, which Spotted Elk attached as an exhibit to his complaint:

Inmate Spotted Elk has been involved in several PREA related sexual assault allegations. The allegations involve threats of force by intimidation (threats with a razor blade) and physical force. Inmate Spotted Elk is currently under investigation by SIU and the DCI. Although he is only currently under investigation at this time it is my opinion that if Inmate Spotted Elk continues to be housed in general population, he will continue to pose a threat to other inmates and that is the reason for this restrictive housing referral.

*Id.* at 32; Doc. 53 ¶ 38. When Spotted Elk was served with the Restrictive Housing Notice of Initial Hearing on July 1, 2020, he waived the 24-hour notice requirement. Doc. 1-1 at 36; Doc. 53 ¶ 30; Doc. 58 ¶ 30.

**B.      Conditions of Confinement in Restrictive Housing**

The conditions of confinement in Restrictive Housing are outlined in the South Dakota Department of Corrections Policy[6] 1.3.D.4 and vary based on the level of Restrictive Housing to which an inmate is assigned. Doc. 50-1. The Restrictive Housing levels span from 1 to 4 with level 1 being the most restrictive and level 4 being the least restrictive. *Id.* at 8. During Spotted Elk's time in Restrictive Housing, he progressed and regressed several times between levels 2, 3,

_____

[6] The policy provided by Spotted Elk was signed on March 7, 2017, Doc. 1-1 at 1–28, but was later revised on May 26, 2021, Doc. 50-1. The Court has reviewed both policies, and the two policies are essentially the same as it pertains to the relevant issues before the Court.

5

and 4 but was never assigned to level 1. Doc. 51 ¶ 13; Doc. 53 ¶ 47; Doc. 58 ¶ 47. Thus, the

remainder of this Memorandum Opinion and Order will discuss levels 2, 3, and 4.

"[I]nmates on restrictive housing status will have access to programs and services,

including education, library services, legal aid, behavioral health and health services, religious

services, recreation (outside their cell) and commissary . . . , contingent upon the level which

they are assigned." Doc. 50-1 at 13. In Restrictive Housing levels 2 and 3, inmates are allowed

60 minutes of recreation time five days a week. Doc. 1-1 at 25. Inmates in level 4 are allowed 60

minutes of recreation time seven days a week. *Id.* Recreation time is limited to a separate indoor

area, and inmates are not provided access to gym equipment. Doc. 36 at 4. The cells in the

Restrictive Housing unit are the same size as the cells in general population; however, only

inmates in levels 3 and 4 are provided televisions. Doc. 1-1 at 25; Doc. 51 ¶ 19; Doc. 53 ¶ 50. All

inmates in Restrictive Housing receive daily showers, laundry services and access to

barbering/hair services and are "issued and allowed to exchange clothing, bedding and linen as

directed in the unit plan." Doc. 1-1 at 11; Doc. 53 ¶ 40; Doc. 58 ¶ 40. Inmates in levels 2, 3, and

4 are allowed telephone privileges and access to their attorney at any time. Doc. 50-1 at 13.

Inmates in levels 2, 3, and 4 have access to class II and class III visits, although the number of

visitors, duration and frequency of visits may be limited. *Id.* at 13–14; Doc. 53 ¶ 46; Doc. 58

¶ 46. Visits may also be temporarily prohibited as a disciplinary sanction. Doc. 50-1 at 13.

Inmates in Restrictive Housing are provided opportunities to participate in certain

programming and approved activities that support transition back to general population such as

General Education Development, chemical dependency, and mental health. Doc. 53 ¶ 45. The

meals provided to inmates in Restrictive Housing are the same as those provided in general

population, although they are provided to inmates in their assigned cell. Doc. 50-1 at 13. Inmates

on Restrictive Housing status "have access to reading materials provided by the library on a regularly scheduled basis[,]" and "[r]eligious materials may be accessed/provided by the Cultural Coordinator." Doc. 53 ¶ 44; Doc. 58 ¶ 44. Although inmates in Restrictive Housing may not be allowed to attend religious activities, there is a Chaplain available who visits the Restrictive Housing unit multiple times a week. Doc. 53 ¶ 52; Doc. 58 ¶ 52. The Chaplain will provide cell-front religious services to those inmates who request it. Doc. 53 ¶ 52; Doc. 58 ¶ 52. Inmates on Restrictive Housing status may send and receive correspondence. Doc. 50-1 at 14.

With regards to health services, "Health Service staff will review the inmate's health record upon placement on Restrictive Housing status to ensure the continuation of medical and dental services/care." *Id.* at 12. "The level of medical needs monitoring provided to inmates on Restrictive Housing status will be determined by Health Services staff." *Id.* While in Restrictive Housing, Behavioral Health staff "observe the inmate's adjustment to placement on restrictive housing status and note any concerns involving the inmate's behavioral health needs." *Id.*

C.    **Length of Confinement in Restrictive Housing**

All inmates begin in level 2, and either progress, regress, or are retained at their current level based on periodic Restrictive Housing status reviews that must occur a minimum of every 30 days throughout the duration of an inmate's placement in Restrictive Housing. Doc. 50-1 at 8; Doc. 53 ¶ 57; Doc. 58 ¶ 57. Consideration for progression, regression, or retainment between levels includes but is not limited to: "(1) the inmate's behavior logs, (2) the inmate's rule compliance, disciplinary violations, and punitive responses, and (3) current program progress and compliance with prescribed programing." Doc. 53 ¶ 58; Doc. 58 ¶ 58.

Spotted Elk was placed in Restrictive Housing level 2 on July 1, 2020. Doc. 53 ¶ 59; Doc. 58 ¶ 59. He returned to the general population on December 21, 2022. Doc. 53 ¶ 55; Doc.

7

58 ¶ 55. While in Restrictive Housing, Spotted Elk received housing status reviews a minimum of every 30 days. Doc. 51 ¶¶ 21, 22; Docs. 50-2 to 50-23. During that time, Spotted Elk progressed and regressed between levels 2, 3, and 4 but was never placed in level 1. Doc. 51 ¶ 13; Docs. 50-2 to 50-23; Doc. 53 ¶ 48; Doc. 58 ¶ 48. Spotted Elk was assigned to level 2 on July 1, 2020, and progressed to level 3 on August 28, 2020. Doc. 50-4; Doc. 53 ¶ 61; Doc. 58 ¶ 61. Spotted Elk was scheduled for a hearing before the level review committee on November 24, 2020, for possible progression to level 4. Doc. 53 ¶ 64; Doc. 58 ¶ 64. The level review committee recommended that Spotted Elk be retained at level 3 for thirty days because he had not completed enough time at level 3. Doc. 50-7 at 2; Doc. 53 ¶ 64; Doc. 58 ¶ 64. On December 24, 2020, Spotted Elk progressed to level 4. Doc. 50-8 at 2. During his time in level 4 from January of 2021 to March of 2021, Spotted Elk continued to be "minimally or non-compliant with behavioral logs," kept "covering his light/window" despite warnings that he must stop doing so, and received a V-16 rule violation. Doc. 50-8; Doc. 50-9; Doc. 50-10. As a result, in March of 2021, the level review committee recommended that Spotted Elk's time in level 4 be extended for an additional 60 days. Doc. 50-11 at 2.

On May 7, 2021, following the 60-day extension, Spotted Elk regressed to level 3 because he was non-compliant with the requirements of the Restrictive Housing program. Doc. 50-13 at 2; Doc. 50-36. After he regressed to level 3, Spotted Elk received multiple rule violations and continued to be non-compliant with behavioral logs. Doc. 50-13 at 1; Doc. 50-14 at 1; Doc. 50-15 at 1–2; Doc. 50-16 at 1–2. On September 16, 2021, Spotted Elk regressed to level 2 because of non-compliance with the Restrictive Housing program requirements. Doc. 50-17 at 2. After he regressed to level 2, Spotted Elk continued to cover his window and light and was non-compliant with behavioral logs according to his October 22, 2021, restrictive housing

8

review. Doc. 50-18 at 1–2. At the time of his November 19, 2021, review, however, he was noted to be compliant with behavioral logs and had progressed to level 3 on November 17, 2021. Doc. 50-19 at 1–2; Doc. 50-31. After progressing back to level 3 on November 17, 2021, Spotted Elk received an M-6, L-14, V-6, and (4) V-10 rule violations. Doc. 53 ¶ 67; Doc 58 ¶ 67. These violations included the misuse of prescribed medications, refusing to submit to a strip search, and swallowing a baggie of an unidentified substance. Doc. 51 ¶ 34.

In December 2021, Spotted Elk received a number of disciplinary write-ups. Doc. 51 ¶ 42. On January 11, 2022, Spotted Elk regressed back to level 2 due to using a weapon in a fight as well as three other disciplinary violations. Doc. 50-32 at 2. When Spotted Elk's housing status was reviewed on March 8, 2022, it was recommended that he be retained at level 2 due to five minor write-ups and non-compliance with behavioral logs. Doc. 53 ¶ 88; Doc. 58 ¶ 88. In Spotted Elk's restrictive housing ten-month review on April 4, 2022, the Warden noted that Spotted Elk had been regressed or retained several times and recently had to start Restricted Housing all over again. Doc. 50-37. The review states that Spotted Elk has shown the ability to progress and complete the program, but continually fails to comply with certain aspects and receives rule violations. *Id.* During his time in Restrictive Housing, Spotted Elk met with a mental health coordinator regularly who stressed the importance for him to take accountability for his actions and move on with everything in his life. *Id.* The mental health coordinator explained that if he does not take accountability, he will continue to remain in Restrictive Housing. *Id.* Throughout the remainder of 2022, Spotted Elk eventually did progress through the level system and returned to general population on December 21, 2022. Doc. 53 ¶¶ 55, 92; Doc. 58 ¶¶ 55, 92.

## III.    First Amendment Retaliation Claim

Spotted Elk submitted an Informal Resolution Request,[7] dated July 8, 2020, alleging that

his Due Process rights were being violated because he was placed in Restrictive Housing based

on an allegation that has not been proven one way or the other. Doc. 50-61; Doc. 53 ¶ 101.

Spotted Elk requested that his Restricted Housing classification be overturned and that be placed

back in Bravo. Doc. 50-61; Doc. 53 ¶ 101. Stoynov responded to Spotted Elk's grievance and

denied Spotted Elk's request, explaining that

> If special circumstances warrant, an inmate's placement on a level(s) may be
> extended, modified, or reduced. Inmates have no implied right or expectation for
> placement on a particular level or for transfer (See SDCL § 24-2-27). The Deputy
> Warden has reviewed the findings and has determined your current placement to
> be appropriate. Therefore, your request is denied.

Doc. 36-1 at 1; Doc. 53 ¶ 102. The Restrictive Housing policy (1.3.D.4) provides that "[t]he

Deputy Warden shall affirm or deny the [Restrictive Housing] Hearing Board's recommendation

within three (3) business days of receipt of the recommendation[.]" Doc. 50-1 at 7. In Spotted

Elk's case, the Deputy Warden, on July 2, 2020, decided that Spotted Elk would be placed in

Restricted Housing as recommended by the Hearing Board. Doc. 1-1 at 30; Doc. 53 ¶ 104; Doc.

58 ¶ 104. Stoynov contends that there is no record evidence that she had any authority to

override the Deputy Warden's decision that Spotted Elk would be placed in Restricted Housing

as recommended by the Board. Doc. 53 ¶ 105. Spotted Elk contends that the Restrictive Housing

policy (1.3.D.4) provides that the decision to place an inmate in Restricted Housing is appealable

through the grievance process, and Stoynov is directly involved with and oversees the grievance

process. Doc. 58 ¶ 105.

---

[7] In his papers, Spotted Elk refers to his July 8, 2020 Informal Resolution Request as a
grievance. *See, e.g.,* Doc. 36 at 11.

Spotted Elk further alleges that after filing the Informal Resolution Request, Alex Hanson, the individual overseeing Spotted Elk's PREA claim, ignored evidence which would have cleared him of the PREA claim and falsified the H-9 write-up to keep Spotted Elk in Restrictive Housing. Doc. 36 at 11. Spotted Elk claims that these adverse actions "can only be motivated" by the initial grievance he filed, and that Defendants knew he would ultimately file a lawsuit. *Id.* at 12.

## DISCUSSION

## I.    Defendants' Motion for Summary Judgment and Standard of Review

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right secured by the Constitution or laws of the United States and must show that the deprivation was committed by a "person" acting under color of state law. *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009); *West v. Atkins*, 487 U.S. 42, 48 (1988). In this case, it is clear that Defendants were acting under color of state law, and Defendants do not dispute such; therefore, the remainder of this Memorandum Opinion and Order will focus on the alleged constitutional deprivations.

After this Court's 1915A screening of Spotted Elk's amended complaint, three claims remain: (1) a Fourteenth Amendment due process claim for insufficient notice against Defendants Ellis, Vanderaa, Bieber, Dreiske, Cook, and Bertsch, in their individual capacities; (2) a Fourteenth Amendment due process claim for insufficient notice against Defendants Benting, Ellis, Vanderaa, Bieber, Cook, Bertsch, Timmerman, Hughes, Ponto, and Jones in their official capacities for injunctive relief only; and (3) a First Amendment retaliation claim against Defendants Hanson and Stoynov, in their individual and official capacities for injunctive relief only. Doc. 35. Defendants move for summary judgment on all of Spotted Elk's claims and argue

11

that Spotted Elk has failed to come forward with sufficient record evidence to allow a reasonable jury to find that his constitutional rights were violated. Docs. 49, 50.

It is well established that summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court examines "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys*, 826 F.3d 1074, 1075 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. *Mayer v. Countrywide Home Loans*, 647 F.3d 789, 791 (8th Cir. 2011). Therefore, to satisfy its burden, the moving party must identify those portions of the record which demonstrate the absence of a genuine issue of material fact or must illustrate that the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When such a situation arises, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the moving party has met its burden, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). This is true of *pro se* litigants as well. *See Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001) ("Like any other civil litigant, [the *pro se* plaintiff] was required to respond to defendants' motions with specific factual support for his claims to avoid summary judgment."); *see also Quam*, 821 F.2d at 522 ("Although Quam is

entitled to the benefit of a liberal construction of his pleadings because of his *pro se* status, Federal Rule of Civil Procedure 56 remains applicable."); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) (per curiam) ("Although *pro se* pleadings are to be construed liberally, *pro se* litigants are not excused from failing to comply with substantive and procedural law."). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 324).

Nevertheless, Spotted Elk's failure to submit specific facts or evidence, "does not automatically compel resolution of [the motion] in favor of [defendants]." *United States v. One Parcel of Real Prop.*, 27 F.3d 327, 329 n.1 (8th Cir. 1994). The Court must determine whether summary judgment is appropriate regardless of whether the opposing party properly responded. *Id.*; *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1213 (8th Cir. 1997) ("When a motion would be dispositive of the merits of the case if granted, courts should normally not treat a failure to respond to the motion as conclusive.").

## II.    Fourteenth Amendment Due Process Claim for Insufficient Notice

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Smith v. McKinney*, 954 F.3d 1075, 1079 (8th Cir. 2020) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "Once a liberty interest is established, the next question is what process is due." *Id.* (quoting *Williams v. Norris*, 111 F. App'x 647, 649 (8th Cir. 2008) (per curiam)). This question need only be answered if the inmate can establish a constitutionally protected liberty interest. *Id.* (citing *Wilkinson*, 545 U.S. at 221). "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse

13

conditions of confinement." *Id.* (quoting *Wilkinson*, 545 U.S. at 221). "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). But "inmates possess a state-created liberty interest in avoiding assignment to conditions of confinement that 'impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Smith*, 954 F.3d at 1080 (alteration in original) (quoting *Wilkinson*, 545 U.S. at 223). Thus, before the Court even reaches the question of what process was due, Spotted Elk must demonstrate that assigning him to Restrictive Housing imposed "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id.* As the Court explains below, he has failed to do so.

The Eighth Circuit Court of Appeals has explained that there is no "established 'baseline from which to measure what is atypical and significant in any particular prison system[.]' " *Smith*, 954 F.3d at 1081 (quoting *Wilkinson*, 545 U.S. at 223). But the Eighth Circuit has "affirmatively held what does not constitute an atypical or significant deprivation." *Id.* For instance, inmates do not have a fundamental right to be housed in the general population, and "demotion to segregation, even without cause, is not itself an atypical and significant hardship." *See id.* at 1082 (quoting *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003)). An inmate "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." *Id.* (quoting *Phillips*, 320 F.3d at 847); *see also Kennedy v. Blankenship*, 100 F.3d 640, 642-43 (8th Cir. 1996) (collecting post-*Sandin* cases in which deprivations were upheld as not atypical and significant hardships).

14

Here, Spotted Elk asserts numerous allegations comparing the conditions in general population to the conditions in Restrictive Housing. For example, he alleges that in general population inmates are unrestrained and permitted to move freely from area to area without being handcuffed. Doc. 36 at 3. He alleges that inmates in general population are allowed to eat together, to attend religious activities, and to participate in programs such as Alternative to Violence, The Fatherhood Program, and Alcoholics Anonymous. *Id.* Inmates in general population also have access to gym equipment and are permitted two hours outside daily. *Id.* Finally, Spotted Elk alleges that inmates in general population can work and gain job experience. *Id.*

In Restrictive Housing, according to Spotted Elk, inmates are handcuffed when moving from area to area, permitted far less recreation time, and the one hour of recreation they get is confined to an indoor caged area. *Id.* Spotted Elk further contends that he was not able to attend religious activities, work, take classes, or utilize gym equipment. *Id.* Additionally, in Spotted Elk's response to Defendants' motion for summary judgment, he alleges for the first time, that "[i]n those first months [he] was housed in Section-One and Section-Two of A-Floor where mentally ill inmates were housed where [he] was subject to the smell of feces, urine, spoiled food, amongst other smells." Doc. 57 at 2. He further claims that he "endured constant crying, screaming and banging as well." *Id.* at 2, 10. In his responsive papers, Spotted Elk also alleges for the first time that the policy outlining the conditions of confinement in Restrictive Housing is not consistently followed in his experience. He contends that he did not receive barbering services, did not have access to General Education Development, there were not televisions in sections 1 and 2, and that prison staff tried to deny him access to his attorney. Doc. 57 at 11–12.

But these are only allegations; Spotted Elk has not submitted any record evidence to support these allegations, and Defendants have submitted record evidence disputing Spotted Elk's allegations. *See* Doc. 50-1; Doc. 51; Doc. 52; Doc. 63; Doc. 64. Spotted Elk's bare allegations are insufficient to oppose a properly supported motion for summary judgment. *See New York Life Ins. Co. v. Torrence*, 592 F. Supp. 3d 836, 840 (D.S.D. 2022) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleadings but must set forth specific facts showing that there is a genuine issue for trial." (internal quotation omitted)).

In any event, even assuming that Spotted Elk's allegations were supported by record evidence, he fails as a matter of law to demonstrate "atypical and significant hardship." It is undisputed that Spotted Elk's transfer to Restrictive Housing resulted in several changes in the conditions of his confinement; however, they do not rise to the level of "atypical and significant hardship." Spotted Elk complains of a significant reduction in recreation time, being handcuffed when moving outside of his cell, and an inability to attend religious activities, maintain a job, take classes, or utilize gym equipment. Courts have consistently held that similar conditions do not impose "atypical and significant hardship." For example, in *Martin v. Hurley*, the court found that "a reduction in his recreation time from 49 to three hours per week; inability to leave his cell for up to three days at a time; inability to participate in religious and secular classes; limited ability to purchase items from the canteen; no contact visits; limited access to telephone, showering, laundry, and library materials; no access to television" did not amount to atypical and significant hardship. No. 2:13-CV-00048, 2015 WL 6750808, at *4 (E.D. Mo. Nov. 5, 2015). In *Killian v. Missouri*, the court concluded that "requiring exercise in an enclosed area" or "a

limitation of out-of-cell exercise" did not necessarily violate the Constitution. No. 4:21-CV-01351, 2022 WL 355110, at *5 (E.D. Mo. Feb. 7, 2022).

Spotted Elk alleges that inmates in general population are unrestrained and may move from area to area without being handcuffed, but courts have routinely held that inmates do not have a fundamental right to be housed in the general population and placement in disciplinary segregation "did not work a major disruption in [an inmate's] environment." *Smith*, 954 F.3d at 1080 (citing *Wilkinson*, 545 U.S. at 221) (reasoning that "inmates in the general population experienced significant amounts of lockdown time"); *see also Freitas v. Ault*, 109 F.3d 1335, 1337-38 (8th Cir. 1997) (finding as a matter of law that one hour of recreation time, fewer phone and visiting privileges, restrictions on what personal items could keep in cells, and limiting movements within the prison did not constitute an atypical and significant hardship).

Likewise, courts have found that limitations on religious services do not give rise to a protected liberty interest. *See Philips*, 320 F.3d at 487 (internal citation omitted) ("Limitations on religious services, especially for a short period of time, have also been found not to present an atypical and significant hardship. Phillips was not prevented from exercising his religion within his cell, thus he was not subjected to an atypical and significant hardship." (internal citation omitted)). Here, consistent with *Phillips*, while Spotted Elk may have been unable to attend religious services, he had access to religious materials and could have exercised his religion in his cell. Additionally, a Chaplain visits the Restrictive Housing unit weekly and provides religious services upon request. Courts have also found that "the denial of work opportunities does not constitute atypical and significant hardship." *King v. Dingle*, 702 F. Supp. 2d 1049, 1077 (D. Minn. 2010) (citing *Freitas*, 109 F.3d at 1337–38). The court explained that "the expectation of keeping a particular job in prison is not a property interest entitled to due process

protection." *Id.* (citing *Lyon v. Farrier*, 727 F.2d 766, 769 (8th Cir. 1984); *see also Smith*, 945 F.3d at 1083 (citing *Freitas.* 109 F.3d at 1338) (holding that the loss of employment, wages, security classification, security points and inmate tier status neither individually or collectively amounted to an atypical or significant hardship.).

Finally, Spotted Elk alleges that he was initially housed with mentally ill patients and subjected to unpleasant smells as well as crying, screaming, and banging. Doc. 57 at 2, 10. Courts have found that similar conditions do not impose atypical and significant hardship. In *Sanchez v. Walker*, the plaintiff complained that his steel toilet had a "brownish buildup" above the water line, which was "hard, . . . like a rock" and which "smell[ed] like urine." No. 09 C 2289, 2010 WL 5313815, at *6 (N.D. Ill. Dec. 17, 2020). The court, however, found that "none of plaintiff's segregation conditions, whether considered individually or together, were sufficiently serious to implicate constitutional concerns." *Id.* at *9. Although stating that plaintiff's segregation conditions were certainly unpleasant, the court held that "harsh and uncomfortable living conditions do not necessarily equal unconstitutional conditions." *Id.* at *19 (citing *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)).

In the Court's view, the only aspect of Spotted Elk's assignment to Restrictive Housing that may amount to "atypical and significant hardship" is the length of time he spent there. Spotted Elk was placed in Restrictive Housing on July 1, 2020, and was not returned to general population until December 21, 2022. But it is undisputed that Spotted Elk was retained and regressed numerous times due to non-compliance with the Restrictive Housing program requirements and numerous disciplinary and rule violations.

Pursuant to the Restrictive Housing policy 1.3.D.4., Spotted Elk began in level 2 and received periodic reviews of his placement. During his first 6 months, Spotted Elk progressed to

level 4. However, during his time at level 4 (January 2021-May 2021), Spotted Elk was minimally or non-compliant with behavioral logs, did not participate in weekly assignments, kept covering his light/window despite warnings that he must stop doing so, and received 4 rule violations. Doc. 50-8; Doc. 50-9; Doc. 50-10; Doc. 50-11. Because of this, the level review committee recommended that Spotted Elk regress to level 3. While in level 3 (May 2021-September 2021), Spotted Elk continued to be noncompliant with the requirements of the Restrictive Housing program and received 9 additional rule violations. Doc. 50-13; Doc. 50-14; Doc. 50-15; Doc. 50-16. As a result, Spotted Elk regressed back to level 2 essentially restarting the Restrictive Housing program from the beginning. Doc. 51 ¶ 32. After progressing back to level 3 at the end of 2021, Spotted Elk received at least seven more rule violations, causing him to regress to level 2 once again in January of 2022. After receiving five more rule violations from January to March of 2022, Spotted Elk finally progressed through the Restrictive Housing program and returned to the general population on December 21, 2022.

Throughout his entire stay in Restrictive Housing, Spotted Elk was repeatedly told what was required for him to progress through the Restrictive Housing levels and return to general population. It was his own behavior and noncompliance with the Restrictive Housing program requirements that resulted in and justifies his extended stay. *See Cummings v. McCarter*, 826 F. Supp. 299, 302 (E.D. Mo. 1993) (finding a 2-year stint in administrative segregation justified because the defendants "presented extensive records documenting the repeated conduct violations that have caused Cummings' lengthy stay in segregated confinement."). Defendants here have done just that. The record is replete with Spotted Elk's monthly reviews thoroughly documenting the repeated conduct violations that lengthened his time in Restrictive Housing.

Accordingly, for the reasons stated above, the Court finds that as a matter of law Spotted Elk has failed to establish a liberty interest from which process was due. Therefore, Defendants' motion for summary judgment on Spotted Elk's Fourteenth Amendment due process claim is granted.

### III.    First Amendment Retaliation Claim

Spotted Elk alleges that Defendants Hanson and Stoynov retaliated against him because he filed an Informal Resolution Request regarding his assignment to Restrictive Housing. Doc. 36 at 11. In his request, Spotted Elk was seeking to have his Restricted Housing classification overturned and requested that he be placed back in Bravo. Doc. 50-61. He alleges that Hanson was overseeing a PREA complaint against him, but when DNA cleared him, Hanson falsified an H-9 write up to keep Spotted Elk in restrictive housing. *Id.* Spotted Elk alleges that Stoynov retaliated against him by denying his Informal Resolution Request seeking to be transferred out of Restricted Housing. Doc. 36  at 1. Spotted Elk claims that these adverse actions "can only be motivated" by the initial grievance he filed and that the Defendants knew he would ultimately file a lawsuit. *Id.* at 12.

"[T]he First Amendment prohibits governmental officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Aldridge v. City of St. Louis*, 75 F.4th 895, 899 (8th Cir. 2023) (citation modified). To establish a claim for First Amendment retaliation, Spotted Elk must prove: "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Scott v. Carpenter*, No. 23-CV-04020, 2023 WL 4249200, at *13 (D.S.D. Jan. 29, 2023) (citing *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th

Cir. 2013)). Filing of a prison grievance is protected First Amendment activity, *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007); thus, the remainder of this Memorandum Opinion and Order will discuss elements two and three.

"Generally, more than a temporal connection is required to present a genuine factual issue on retaliation." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) (internal quotation omitted). Spotted Elk's allegation that Hanson's and Stoynov's conduct was retaliatory is entirely speculative and unsupported by any competent, admissible evidence. Merely alleging that an act was retaliatory is insufficient. *See Gard v. Dooley*, No. 14-CV-04023, 2016 WL 5376236, at *31 (D.S.D. Mar. 4, 2016) (explaining that conclusory allegations of retaliation unsupported by record evidence will not withstand summary judgment.). To demonstrate the causal link to support his retaliation claim, Spotted Elk must present evidence from which a reasonable jury could find that "the adverse action against . . . [him] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." *Id.* at 398. When there is an "obvious alternative explanation" for the officers' allegedly retaliatory conduct, the but-for causation requirement is not satisfied. *Aldridge*, 75 F.4th at 899–90.

While it is true that inmates may maintain a cause of action for retaliatory discipline where a prison official files disciplinary charges in retaliation for the exercise of a constitutional right, "claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule." *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008). "Thus, a defendant may successfully defend a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Id.* Under this standard, it is well established that

21

a "report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Id.* at 831; *Santiago v. Blair*, 707 F.3d 984, 993 (8th Cir. 2013). As such, the critical inquiry regarding the claim against Hanson, is "whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation...." *Brakeall v. Stanwick-Klemik*, No. 17-CV-04101, 2020 WL 1180727, at *19 (D.S.D. Mar. 11, 2020).

In the instant case, following the submission of the PREA claim against Spotted Elk, the South Dakota Department of Corrections and DCI conducted an investigation of the claimed incident. Doc. 1-1 at 63–65. The DCI conducted an initial interview, polygraph, and post polygraph interview of Spotted Elk. Doc. 1-1 at 64. The DCI concluded that Spotted Elk failed the polygraph and submitted their findings to the Disciplinary Hearing Officer along with video and audio footage of the interviews and polygraph. Doc. 1-1 at 63–65. On January 5, 2021, based on the DCI findings, video/audio footage, the victim statement, the PREA report, and the write up, the Disciplinary Hearing Officer entered findings that Spotted Elk had indeed committed the charged violation: H-9 Inmate Sexual Assault. Doc. 1-1 at 65. This certainly meets the criteria of some evidence, and there is no showing that the Disciplinary Hearing Officer was partial in making the decision. Accordingly, consistent with *Hartsfield* and *Santiago*, the Court finds that Spotted Elk's retaliation claim against Hanson fails as a matter of law.

With regards to the claim against Stoynov, Spotted Elk alleges that her denial of his Informal Resolution Request was in retaliation for filing the Informal Resolution Request. This cannot be the case – if so, every denied grievance would be retaliatory. Indeed, it is well established that "the denial of a grievance or denial of the inmate grievance process is not

22

sufficiently adverse on an objective basis." *Gordon v. Bertsch*, No. 15-CV-026, 2015 WL 10319307, at * 9 (D.N.D. Oct. 30, 2015); *see, e.g., Dicey v. Hanks,* No. 14-CV-2018, 2015 WL 4879627, at *5 (E.D. Cal. Aug. 15, 2015) ("denial of a grievance neither constitutes an adverse action that is more than de minimis nor is it sufficient to deter a prisoner of 'ordinary firmness' from further First Amendment action"); *Frazier v. Zavaras,* No. 10-CV-02534, 2011 WL 4537001, at *9 (D. Colo. Sept. 30, 2011) ("denial of an administrative grievance is not an 'adverse action' "); *Burgos v. Canino,* 641 F. Supp. 2d 443, 454 (E.D. Pa.2009) ("The rejection or denial of grievances does not, by itself, suggest that the action was adverse or retaliatory."); *Martin v. Woodford,* No. 1:08-cv-00415, 2009 WL 30300, at **5–6 (E.D. Cal. Jan. 6, 2009) (discussing why denial of an administrative grievance does not constitute adverse action and recommending dismissal of retaliation claims based on such denials at the screening stage for not stating a cognizable claim).

Moreover, there is no showing of retaliatory motive on the part of Stoynov. To succeed on his retaliation claim, Spotted Elk must "show that the protected activity was a 'but-for cause' of the adverse action, meaning that the adverse action against [him] would not have been taken absent [a] retaliatory motive." *De Rossitte v. Correct Care Solutions, LLC.*, 22 F.4th 796, 804 (8th Cir. 2022). While recognizing that retaliatory motive is "generally a jury question," summary judgment is appropriate "when the question is so free from doubt as to justify taking it from the jury." *Id.*

Here, it is undisputed that the Deputy Warden "determined [Spotted Elk's] placement to be appropriate." Doc. 36 at 1. Pursuant to SDDOC Policy 1.3.D.4, "The Deputy Warden shall affirm or deny the Hearing Board's recommendation within three (3) business days of receipt of the recommendation[.]" Doc. 50-1 at 7. As further provided therein, "Restrictive Housing staff will provide a copy of the *Restrictive Housing Hearing Board Findings and Disposition* form to

the Inmate. This will include the final determination by the Deputy Warden." *Id.* Here, the

"Deputy Warden's Decision," on July 2, 2020, was to "Place inmate in Restricted Housing as

recommended by the Board." Doc. 1-1 at 30. There is nothing in the record which would suggest

that Defendant Stoynov had authority to override the decision of either the Deputy Warden or the

Level Review Committee. Plainly then, the decision to retain Spotted Elk in Restrictive Housing

was not hers to make, and the Court will not attribute a retaliatory motive to Stoynov for a

decision made by someone else. Therefore, for the reasons stated above, Spotted Elk's retaliation

claim against Stoynov fails as a matter of law. Defendants' motion for summary judgment on

Spotted Elk's First Amendment retaliation claim is granted.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1.      Defendants' motion for summary judgment (Doc. 49), is GRANTED; and

2.      Spotted Elk's claims are dismissed with prejudice.

DATED this 30th day of July, 2025.

BY THE COURT:

LAWRENCE L. PIERSOL
United States District Judge